UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANICE WASHINGTON,

      Plaintiff,                        Case No. 5:20-cv-10289
                                        District Judge Judith E. Levy
v.                                  Magistrate Judge Kimberly G. Altman

WAYNE COUNTY COMMUNITY
COLLEGE FEDERATION OF
TEACHERS,

      Defendants.

_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 8)

### I.  Introduction

This is an employment case claiming disability and gender discrimination. Plaintiff Janice Washington asserts claims under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. 2000e *et seq*., the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*., the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), M.C.L. § 37.1210 *et seq*., and the Michigan Elliott–Larsen Civil Rights Act (ELCRA), M.C.L. § 37.2101 *et seq*.  Defendant, the Wayne County Community College Federation of Teachers (the Union), has moved for summary judgment on all claims.  Specifically, the Union asks the

Court to dismiss Washington's federal claims, to exercise supplemental jurisdiction over Washington's state law claims, and grant summary judgment to the Union on her state law claims.  (ECF No. 8).  Washington filed a response, the Union filed a reply, and a hearing was held on April 7, 2021.  (ECF Nos. 10, 11).  For the reasons that follow, the undersigned recommends that the Union's motion be **GRANTED**.

## II.  Background

This suit was initially brought in the circuit court for the County of Wayne.  The Union removed the case to federal court based on federal question jurisdiction.  *See* ECF No. 1.

Washington began working for the Union, as one of two paid employees of the Union, in October 2005 as a bookkeeper.  (ECF No. 8-14, PageID.90).  The other paid employee, Dessine Mack, was the Union receptionist.  At the times relevant to this case, Washington was supervised by the Union's president, Christian Nwamba, and its treasurer, Roger Short.  (ECF No. 10-1, PageID.210; ECF No. 10-2, PageID.238).  Washington's job duties were to make sure that the Union's collected dues were disbursed accurately to affiliated organizations.  (ECF No. 8-14, PageID.97-99).  If this is not done in a timely manner, the Union and its members can become in bad standing with the affiliates.  *See* ECF No. 8-2; ECF No. 8-10.  Washington worked on the third floor of a building in Detroit, and her

work was done on a computer, entering and manipulating data using computer software.  (*Id*., PageID.103-104).

Washington was initially hired in part-time capacity, but in the fall of 2013 was made a full-time employee.  (*Id*., PageID.136).  Near the beginning of 2015, her hours were cut from 40 per week to 28 per week, so that the Union would not have to cover health care.  (*Id*.).  And in March 2018, her hours were further reduced to 20 per week.  (*Id*.).  According to defense counsel at the hearing, this was again due to health care coverage, specifically the passage of the Affordable Care Act.  Washington testified that when her weekly hours were reduced from 28 to 20, her workload remained the same, though Short testified that the Union "reduced her areas of responsibility" in conjunction with the decrease in hours. (ECF No. 10-2, PageID.234; ECF No. 8-14, PageID.138).  Washington's last contract, signed in April 2018, provided that she had 60 days from receipt of the dues to have them processed and sent to the Union's affiliates.  *See* ECF No. 10-4, PageID.273.  At all relevant times, Washington was an at-will employee of the Union.  (ECF No. 10-4, PageID.271).

Washington had surgery on her left ankle three times while employed by the Union; the first was in March 2012, the second in August 2017, and the third—the subject of this litigation—in January 2019.  (ECF No. 8-14, PageID.106-108).  The circumstances surrounding her third leave will be discussed in more detail below.

According to Washington, during her medical leave following her first surgery, the treasurer of the Union at that time—not Short—handled the in-office duties while Washington answered the phone and e-mails from home.  (ECF No. 8-14, PageID.139).  This took place for approximately six to eight weeks.  (*Id*.).  During her second leave, which was "about six weeks," she did all of her work from home.  (*Id*.).

On June 11, 2018, the Union received a letter from the American Federation of Teachers (AFT National) that the Union's per-capita obligations were behind.  (ECF No. 8-2).  Specifically, AFT National had not received a payment since the January 2018 period, meaning the dues had not been paid in four months for February, three months for March, two months for April, and one month for May.  (*Id*.).  The letter stated in part, "this letter is a formal notification that the arrearages must be remedied within the next 30 days," or that "the AFT is required to notify the affiliate's executive board, with a copy to the state federation, that the local is in arrears and to again request that corrective action be taken."  (ECF No. 8-2, PageID.58).  "Should the arrearage remain outstanding 30 days after that, the AFT president is required to communicate directly with the affiliate's members to inform them of the arrearage and of the consequences of bad standing for both the affiliate and for individual members."  (*Id*.).

The next day, Nwamba notified Washington via email that AFT National

needed to be paid through May 30, 2018 by June 30, 2018.  (ECF No. 8-4).

Washington responded via email that the dues for May 18, 2018 "should be done

by July 25, 2018."  (*Id*.).  Nwamba replied as follows:

> Janice,
>
> Everyone including you have been aware of the need and urgency to have this per capital dues paid ASAP and no later than June 30th, 2018.  This was pointed out and stressed to you while Yhasmin Bryant from National was here in April to review the finances if the local with you and the treasurer.
>
> The excuse and explanation of not having the computation of these May per capita due ready and paid timely in its entirety before June 30th is not acceptable to the local's executive board.
>
> We don't see what obstacle there is in getting the accurate dues calculated and correct, accurate check generated and mailed out to national and all other associated affiliations of the local within the next 14 days which will be June 26th or earlier.
>
> Please, start this week to work on the May dues roaster and generate exact, accurate dues payable and mail such out to state and national before June 26th, 2018.  Failure to do so will imply some possible executive decision relating to your role and employment with the local.

(ECF No. 8-4, PageID.60 [*sic* throughout]).

Washington responded:

> Dr. Nwamba,
>
> Per the contract I signed I have 2 months to get the dues done.  I will not be threatened to get work done for a conference.  I asked multiple times during the meeting about my contract if dues was related to conferences and was told 4 different times that it had nothing to do with conferences but for us to stay update with dues being paid.  If this is not the case I will not need something in writing from the Executive Board which states my contract is

5

incorrect.  If my job is on the line for not having the numbers for April and May dues because they were brought into the office May 16 and May 25 than you are violating my contract signed in March 2018.

(*Id*. [*sic* throughout]).

On July 25, 2018, Short sent a letter to Washington, thanking her for her efforts in getting the per-capita payments to the affiliates on time, and informing her that the Executive Board had come to the conclusion that the original sixty-day deadline for submitting payments was too long to ensure that the payments are submitted timely.  (ECF No. 8-6).  Per-capita reports would now be due within two weeks of their receipt, to ensure a more even workflow and timely processing. (*Id*.).  Nothing in the record indicates that Washington complained about this change at that time.

On January 3, 2019, Washington sent an email to Short and others stating that she will need another surgery on her ankle and "I will be on leave as of January 23, 2018 [*sic*]" and she was "expecting to be out 3 to 6 weeks."  (ECF No. 8-7, PageID.64).   Nwamba responded, in part, that the Union would "adjust and accommodate the office personnel needs during the time of your requested 'leave of absence'.  Let's hope that Dessine may be fully recovered and able to return back to work in some way by then."  (*Id*.).

On January 25, 2019, the Union received another letter from AFT National. (ECF No. 8-8).  Like the first letter, it stated that AFT National had not received a

payment since the August 2018 period, meaning the dues had not been paid in four months for September, three months for October, two months for November, and one month for December. (*Id*.). And in the same language as the first letter, it warned of the consequences of further delay in payment. (*Id*.).

While Washington was off for her third surgery, from January to February 2019, she was not allowed to work from home and could not physically come into the office to work. (*Id*., PageID.142-143).

Washington returned to work around February 25, 2019. (*Id*, PageID.113). She was unable to use the stairs, so when the elevator was not working, she was given paid leave for the day. (*Id*., PageID.108-109). She also required the use of a scooter to ambulate, which the Union allowed. (*Id*., PageID.113-114). Despite these challenges and the discomfort caused by the surgery, the disability did not prevent Washington from being able to do her job in the office upon her return. (*Id*., PageID.114-115).

On March 18, 2019, after Washington had been back to work for almost a month, AFT National sent a third letter to the Union. In the same language as the prior two, this letter notified the Union that the last per-capita payment was for the period September 2018, putting the Union's payments behind by approximately one additional month. (ECF No. 8-10). October's dues were now unpaid for four

and a half to five months, with November, December, January, February, and March unpaid as well.

On the morning of April 4, 2019, Washington received an e-mail from Short noting that they had recently discussed the need to bring per-capita payments current, and that there had been notices from AFT National and AFT Michigan regarding lack of timely payments.[1] (ECF No. 8-12). Short attached the March 18, 2019 letter from AFT National. (ECF No. 8-10). He added that despite having discussed bringing the Union's payments current and having received notice of late payments from two affiliates, he had not seen a submitted per-capita report from Washington since her return in late February. (ECF No. 8-12). Short set a schedule for Washington to file her reports by, with the intention to "address this immediate situation and establish a process to insure timely filling [*sic*]" of her reports. (*Id*. PageID.69-70). "By end of business next Thursday April 11th all cap reports through calendar year 2018 must be prepared and ready for mailing. The second step is to have all Cap Reports through March 2019 prepared and ready for mailing no later than end of business day Wednesday April 17th." (*Id*.). Going forward, "cap reports will be filed within 15 days of receipt of the dues list in our office." (*Id*.).

---

[1] The correspondences referenced by Short from AFT Michigan were not provided in the Union's motion.

In response, Washington wrote the following email, which was received by

Short and Nwamba, among others:

> Before I went on my medical leave I informed you that the dues for October
> 2018 had just been started.  I was off for 6 weeks and no dues were
> processed by the Treasurer in my absence.  I have told you on more than one
> occasion this takes time.  Per my contract I have 60 days to input the dues
> into the system.  If you would like to take over this task I will gladly give it
> to you.  I will not be bullied or threaten by members of the executive board
> for dues to be done.  I have only finished October and have just started on
> November.  If you would like to do November thru February to get to your
> deadline feel free to come in the office and get the both parts of the dues
> roster part time faculty for percentage and dues to cross reference each to
> make sure that you have an accurate list of dues paying members.

(*Id*.).  Plaintiff's counsel characterizes this as a request for an accommodation to

the disability that kept Washington out of work, from January to February 25,

2019.  (ECF No. 10, PageID.187, citing ECF No. 8-14, PageID.115, 154-155).

According to Short, the Union's executive board had already reached "the

decision in principle" to terminate Washington at some point while she was on

leave, based on the letters from AFT National in June 2018 and January 2019.

(ECF No. 10-2, PageID.251-253).  That decision was made final at the Union's

"Emergency Executive Board Meeting" on April 30, 2019.  (ECF No. 10-5).  The

minutes reflect that Washington had been presented a new contract, but had not yet

signed it, and that "after a brief deliberation," Short moved that Washington's

employment be terminated immediately.  (*Id*.).    The motion carried with no

objections.  (*Id*.).  From that date, and as of Short's deposition on November 30,

2020, Short has been doing the bookkeeping work that was previously done by Washington.  (ECF No. 10-2, PageID.236).  He testified that it was "relatively easy" to pick up the work, given his prior work experience in the field and access to the bank accounts and dues rosters.  (*Id*., PageID.237).  According to defense counsel at the April 7, 2021 hearing, Washington's position has yet to be filled, possibly due to the COVID-19 pandemic and the resulting reduction in workload for the position.

The Union now moves for summary judgment on all claims, asserting that the federal statutes do not reach the Union as an employer, that Washington's requested accommodation was unreasonable, and that neither its denial nor her ultimate termination were based on disability or gender discrimination.  (ECF No. 8).  Washington responds that her request for assistance with the work that had built up in her absence was reasonable, and that its denial and her termination were unlawfully based on her disability and gender.  (ECF No. 10).

### III.  Summary Judgment

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court

"views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists...." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact," the court may "consider the fact undisputed for purposes of the motion"). If a moving party fails to meet this initial burden, the non-moving party has no duty to present countervailing evidence; indeed, a court abuses its discretion if it grants a summary judgment motion where the moving party has not met its burden. *Hunter v. Caliber System, Inc.,* 220 F.3d 702, 726 (6th Cir. 2000). "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.' " *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The nonmoving party "must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) ("The nonmovant must ... do more than

simply show that there is some metaphysical doubt as to the material facts[.] ...

[T]here must be evidence upon which a reasonable jury could return a verdict in

favor of the non-moving party to create a genuine dispute.") (internal quotation

marks and citations omitted).  "Such evidence submitted in opposition to a motion

for summary judgment must be admissible." *Alexander*, 576 F.3d at 558 (internal

quotation marks and citations omitted).  In other words, summary judgment is

appropriate when the motion "is properly made and supported and the nonmoving

party fails to respond with a showing sufficient to establish an essential element of

its case[.] ..." *Stansberry*, 651 F.3d at 486 (*citing Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986)).

## IV.  Analysis

### A.  Federal Claims and Supplemental Jurisdiction

At the onset, the Union notes that it only employed two individuals at all

relevant times to this litigation.  (ECF No. 8, PageID.38).  Title VII and the ADA

cover only organizations of 25 or more employees and over 15 employees,

respectively.  (*Id*., citing 42 U.S.C. § 2000e(b) and 42 U.S.C. § 12111(5)).  Both

statutes also cover labor organizations, with the ADA incorporating Title VII's

definition of a labor organization.  42 U.S.C. § 12111(7).  The plain language of

both statutes makes clear that a labor organization can be sued as an employer

when dealing with employees, as opposed to members, of the organization.  *See*

*Phillips v. UAW Int'l*, 149 F. Supp. 3d 790, 802 (E.D. Mich. 2016), *aff'd on other grounds,* 854 F.3d 323 (6th Cir. 2017) (quoting *Ferroni v. Teamsters, Chauffeurs & Warehousemen Local No. 222*, 297 F.3d 1146, 1151 (10th Cir. 2002)).  In her response, Washington agrees that the Union does not meet the employee requirements for Title VII or the ADA.  The undersigned therefore recommends that these federal claims be dismissed.

Both parties, however, request that the Court exercise supplemental jurisdiction over her state law claims under 28 U.S.C. § 1367, "as a matter of comity and to avoid unnecessary litigation expense to the parties."  "In determining whether to retain jurisdiction over state-law claims, a district court should consider and weigh several factors, including the 'values of judicial economy, convenience, fairness, and comity.' "  *Gamel v. City of Cincinnati*, 625 F.3d 949, 951-52 (6th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343 (1988)). Within that framework, the Sixth Circuit has found that (1) the parties having completed discovery, (2) summary judgment motions being ripe for decision, and (3) the court being "familiar with the facts of the case and already [having] invested significant time in the litigation" were factors that weighed in favor of exercising supplemental jurisdiction over the remaining state law claims.  *Gamel*, 625 F.3d at 952 (quoting *Harper v. AutoAlliance Intern., Inc.,* 392 F.3d 195, 211-12 (6th Cir.2004)).

Here, as in *Gamel*, the parties have completed discovery and the case is ripe for summary judgment.  Judicial economy would be served by the Court retaining supplemental jurisdiction.  As such, the undersigned recommends retaining jurisdiction over Washington's state law claims.  These claims are discussed in turn below.

## B.   PWDCRA

As an initial matter, Washington claims that the Union violated the PWDCRA by not honoring her request for an accommodation and by terminating her because of her need for an accommodation.

### 1.   Denial of requested accommodation

#### a.   General

The PWDCRA[2] generally provides that "a person shall accommodate a person with a disability for purposes of employment, public accommodation, public service, education, or housing unless the person demonstrates that the accommodation imposes an undue hardship."  M.C.L. § 37.1102(2).  To establish a prima facie case for failure to accommodate, a plaintiff must demonstrate that: "(1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the

---

[2] The PWDCRA and ADA have similar purposes and share some definitions. Michigan courts have thus looked to ADA cases for guidance, but federal cases interpreting the ADA are merely persuasive, not binding.  *See, generally, Steckloff v. Wayne State Univ.*, No. 18-13230, 2020 WL 3428966, at *5 n.5 (E.D. Mich. June 23, 2020).

position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation." *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004)). "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer," in which case it is no longer a reasonable accommodation and the employer is not compelled to offer it. *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018).

The phrase "with or without accommodation" guarantees that an individual otherwise qualified for a particular job or position is entitled to some accommodation if needed. *Cunningham v. USF Holland, Inc.*, 2013 WL 1748563, at *5 (Mich. Ct. App. Apr. 23, 2013). However, the PWDCRA does not require an employer to modify primary duties as an accommodation, nor is an employer required to transfer an employee to another position. M.C.L. § 37.1210(15); *Rourk v. Oakwood Hosp Corp*, 458 Mich. 25, 31 (1998).

As explained in *Rourk*, the PWDCRA specifically identifies the following types of accommodation: "(1) purchasing equipment and devices, (2) reasonable routine maintenance or repair of such equipment and devices, (3) hiring readers

and interpreters, and (4) restructuring jobs and altering schedules for minor and infrequent duties." *Rourk*, 458 Mich. 33.  But an employer with fewer than 15 employees, like the Union here, is not required to restructure a job or alter the schedule of employees as an accommodation.  M.C.L. § 37.1210(14).  *Rourk* recognized that these accommodations were not an "exhaustive list" of accommodations but provided guidance as to the types of accommodations the Legislature contemplated.  *Id.*

Under the PWDCRA, requests for accommodations are required to be in writing.  M.C.L. § 37.1210(18).

### b.  Application

As a preliminary matter, the parties appear to disagree on the parameters of Washington's request for accommodation.  As noted above, Washington styles her April 4, 2019 e-mail correspondence to Short and Nwamba as a request for accommodation in the form of assistance with completion of filing per capita reports.  (ECF No. 10, PageID.186-187, citing ECF No. 8-12).  The Union contends that this was not a formal request, and that it was not for an "accommodation," but for someone else to do her work.  (ECF No. 8, PageID.46-51).  Washington also alludes to other requested relief: "The assistance Plaintiff sought could have been somebody else doing the work, Defendant allowing her

16

more hours or Defendant allowing her to work from home." (ECF No. 10, PageID.187, citing ECF No. 8-14 PageID.154).

"Absent a written request for accommodation, a plaintiff alleging a failure to accommodate claim cannot prevail." *Estate of Jackson by Jackson v. 36th Dist. Court*, 2019 WL 4180178, at *5 (Mich. Ct. App. Sept. 3, 2019) (citing *Petzold v. Borman's, Inc.*, 241 Mich. App. 707, 716 (2000)); *see also* MCL 37.1210(18). Based on the evidence before the Court, the only request for accommodation that can be considered is that Washington asked Short to assist her in filing her reports. Despite Washington's testimony that she was told she could not work from home during her most recent medical leave, (ECF No. 8-14, PageID.140-141), she did not request to do so in writing, nor did she request more work hours in writing. She did request assistance in completing her reports from Short in writing. Although the Union insists this was not a formal request, when viewed in the light most favorable to the nonmoving party, it can be seen as a written request for accommodation under the PWDCRA.

Having narrowed the issue to the request that Short do some of Washington's primary job duties,[3] the undersigned finds that the request did not meet the parameters required of accommodations under M.C.R. § 37.1210.  Citing

---

[3] The parties do not dispute that filing the reports in question are Washington's primary job duties.

federal cases applicable to the ADA,[4] the Union notes that a qualified individual under that act must be able to "perform the essential functions" of a job "with or without reasonable accommodation." *Popeck v. Rawlings, Co., LLC*, 791 F. App'x 535, 539 (6th Cir. 2019) (citing 42 U.S.C. § 12111(8)). "But no employer need excuse a disabled employee's performance of a job's 'essential functions'; a proposed accommodation requesting the removal of an essential function is per se unreasonable." *Id*. (citing *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998)). In *Popeck*, the court first considered whether "regular, in-person attendance" was an essential function. *Id*. But that is not an issue in this matter, as Washington did not make a valid request to work from home following her third ankle surgery. Next, the *Popeck* court considered an accommodation that was "modest on its face: occasional flexibility to arrive late and leave early." *Id*. The court noted that because the plaintiff required more time off than she proposed, she failed to suggest an accommodation that would enable her to meet the essential functions of her employment. *Id*. at 539-540.

Applying *Popeck* to the PWDCRA is simple. Just as the ADA requires a qualified individual to be able to perform the essential functions of a job with or without reasonable accommodation, the PWDCRA defines a disability as a characteristic that "is unrelated to the individual's ability to perform the duties of a

---

[4] *See supra* n.1.

particular job." M.C.L. § 37.1103(d)(*i*)(A). This means that an accommodation cannot be required that would modify an employee's primary duties. M.C.L. § 37.1210(15); *Rourk v. Oakwood Hosp Corp*, 458 Mich. 25, 31 (1998). Thus, the rule that an accommodation requesting removal of a primary duty is per se unreasonable applies here. *Popeck*, 791 F. App'x at 539.

The Union also cites *Hoskins v. Oakland Cty. Sheriff's Dep't* for the proposition that "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." 227 F.3d 719, 729 (6th Cir. 2000) (citing *Bratten v. SSI Servs., Inc.,* 185 F.3d 625, 632 (6th Cir. 1999)). Based on the above analysis, this too would apply to the PWDCRA, and it is almost exactly what Washington requests: shifting some of her report-filing duties to Short.

Washington notes that the holding from *Hoskins* was limited in *Gunter v. Bemis Co., Inc.*, 906 F.3d 484 (6th Cir. 2018). In *Gunter*, a press assistant injured his shoulder while working at a printing company. *Gunter* at 487. His doctor allowed him to return to work with some restrictions, including that he "could lift up to 40 pounds occasionally and 20 pounds frequently from the floor to his waist, could lift up to 20 pounds occasionally from his waist to his chest." *Id*. at 488. The printing company, Bemis, fired him despite evidence that the company "encourages employees not to lift anything over 40 pounds by themselves", and

19

that "employees can ask their coworkers to help lift [equipment under 40 pounds] and often do. *Id*. at 489.  The court found:

> Employers, it is no doubt true, need not "accommodate individuals by shifting an essential job function onto others."  *Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000).  But the argument assumes that these tasks amount to essential functions that a single employee must be able to handle.  The jury heard evidence to the contrary—that press workers often ask for and receive help with certain tasks—permitting it to find that this was not an indispensable task for individual employees. . . .  In the last analysis, Gunter presented sufficient evidence to create a triable issue of fact over the essential job requirements of a press operator, making the final resolution one for the jury, not for us.

*Id*. at 489.

*Gunter* is distinguishable.  Washington does not request assistance with one aspect of her otherwise primary duties due to her disability; she requested six to seven weeks' worth of her entire primary duty to be done by Short to help her catch up at work.  She has not presented an issue of fact as to the essential requirements of the job.  Her claim falls squarely under the rule in *Hoskins*, and not under the exception presented in *Gunter*.  Washington has simply fallen behind on reports, as she had in 2018 prior to her surgery, and the assistance she requests is not required of the Union to provide under *Hoskins*.

Furthermore, the same result is dictated by the plain text of the PWDCRA.  M.C.L. § 37.1210(15) states that "[j]ob restructuring and altering the schedule of employees under this article applies only to *minor or infrequent duties* relating to the particular job held by the person with a disability." (emphasis added).  And

20

M.C.L. § 37.1210(14) goes even further, stating that employers with fewer than 15 employees are "not required to restructure a job or alter the schedule of employees as an accommodation" at all.  As put by the Michigan Court of Appeals, "[a]n employer is not required under the PWDCRA 'to accommodate the plaintiff by recreating the position, adjusting or modifying job duties otherwise required by the job description, or placing the plaintiff in another position.' " *Howard v. Michigan Dep't of Corr.*, No. 304258, 2013 WL 2223133, at *8 (Mich. Ct. App. May 21, 2013) (quoting *Kerns v. Dura Mech. Components, Inc.,* 242 Mich.App 1, 16 (2000)).  Thus, it is clear that the Court cannot impose on the Union a requirement to assist Washington with the filing of per capita reports.  As such, she has not made out a prima facie case of a failure to accommodate because her requested accommodation is simply not within the confines of the PWDCRA.  The only accommodation that was required based on her surgery was the use of a scooter, which the Union allowed.  Her request for an accommodation came after she returned to work for at least a month and was able to perform her job duties.

Moreover, even assuming Washington's request for accommodation was reasonable, the Union argues that it would have imposed an undue burden.  "Once a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer," in which case it is no longer a reasonable accommodation and

the employer is not compelled to offer it.  *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018).

The Union, through Short, asserts that "[t]he Union has functioned with two employees for many years.  It never had the capacity to employ three persons." (ECF No. 8, PageID.52).  In Short's words, the Union "was never in a position where it could afford to engage additional personnel to assume part or all of [Washington's] work.  Adding personnel would have been an impossible burden." (ECF No. 8-1, PageID.57).  Because Washington never made a written request that an additional employee be hired to assist her, it is not necessary to reach this argument.  However, the Court notes that based on the discussion above, requiring the Union to hire additional staff to help perform Washington's job duties under the circumstances is simply not contemplated by the PWDCRA.

### 2. Termination on the basis of disability

#### a. General

Washington also alleges that she was terminated due to her disability.  (ECF No. 1, PageID.9).  A discriminatory termination can be shown through direct or indirect evidence.  *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891-92 (6th Cir. 2016).  There is no direct evidence that she was terminated because of her disability.  Therefore, she can only establish a prima facie case of discrimination through the indirect evidence framework, which requires a plaintiff to show "that

22

(1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment decision, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Id.*

Once the plaintiff establishes a prima facie case, "the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Gunn v. Senior Servs. of N. Kentucky*, 632 F. App'x 839, 843 (6th Cir. 2015). If the defendant does so, the burden then shifts back to the plaintiff, who "must demonstrate that the stated justification is merely pretext." *Id*. To demonstrate pretext, Washington must show "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Daughenbaugh v. Macomb Residential Opportunities, Inc.*, No. 15-CV-12390, 2016 WL 7158648, at *8 (E.D. Mich. Dec. 8, 2016) (citing *Ferrari v. Ford Motor Co.*, 826 F.3d at 895).

### b. Application

Neither party has presented argument on whether Washington has satisfied the elements of a prima facie case for disability discrimination. Even assuming, arguendo, that she has, the Union contends that it had a legitimate, non-

discriminatory reason for her termination, and Washington has no evidence to demonstrate a pretextual termination.  Under the first prong, the parties agree that Washington fell behind in work and requested assistance as the only way to catch up.  Under the second prong, the lynchpin to Washington's argument is the recorded minutes of the executive board meeting wherein the decision to terminate her was made.  (ECF No. 10-5).  Short testified that he and Nwamba "jointly laid out the evidence and made a recommendation" to terminate Washington at the April 30, 2019 board meeting, and that the board's decision to terminate was unanimous.  (ECF No. 10-2, PageID.261-262).

Washington says that this was not the case, as "the only reason that can be gleaned from those minutes for Plaintiff's termination is that Plaintiff had not yet signed her contract for the 2019-2020 year."  (ECF No. 10, PageID.198).  It is true that the meeting minutes do not lay out the reason for Washington's termination.  *See* ECF No. 10-5.  As noted above, they contain reference to Washington having not signed her contract, but also state that "[a]fter a brief deliberation, a motion [was] made by Roger Short . . . that the employment of Janice Washington be terminated effective immediately."  *Id*.  Essentially, nothing can be gleaned whatsoever from the minutes as to the reason Washington was let go.  The only evidence presented by either side as to why Washington was terminated is Short's testimony that he and Nwamba recommended her termination due to her inability

to complete reports on time.  (ECF No. 10-2, PageID.251-253).  This evidence alone would not foreclose the possibility of a pretextual firing, but there is no evidence to consider in the other direction.  As such, there is no evidence upon which a reasonable jury could return a verdict in Washington's favor on this issue. *Lee*, 432 F. App'x at 441.  Washington simply cannot show that her termination was a pretext for disability discrimination, i.e. that she was terminated because of her ankle surgery.

In sum, the Union accommodated her disability by permitting her to use a scooter.  The Union was not required under the PWDCRA to honor her request for Short to assist her with her work.  Further, Washington has not shown that either a failure to accommodate her request or her termination was a pretext for disability discrimination.  Overall, the undersigned finds that the Union is entitled to summary judgment on Washington's PWDCRA claim.

## C.  ELCRA

### 1.  General

Section 202 of ELCRA provides that "[a]n employer shall not ... [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status."  M.C.L. § 37.2202(1)(a).

Primarily, "[c]ases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases." *In re Rodriguez,* 487 F.3d 1001, 1007 (6th Cir. 2007) (citing *Humenny v. Genex Corp.,* 390 F.3d 901, 906 (6th Cir. 2004)); *see Sniecinski v. Blue Cross & Blue Shield of Mich.,* 469 Mich. 124, 666 N.W.2d 186, 193 (2003). "Intentional discrimination can be proven by direct and circumstantial evidence." *DeBrow v. Century 21 Great Lakes, Inc.,* 463 Mich. 534, 620 N.W.2d 836, 838 (2001). "In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 926 (6th Cir. 1999). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.,* 319 F.3d 858, 865 (6th Cir. 2003). "In direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000).

"A plaintiff who lacks direct evidence of discrimination may still establish a *prima facie* case of discrimination by proving the elements of [his] cause of action as set out in federal discrimination jurisprudence." *Tinker v. Sears, Roebuck & Co.,* 127 F.3d 519, 522 (6th Cir. 1997). Michigan courts utilize the federal *McDonnell Douglas* burden-shifting framework for evaluating discrimination claims founded upon circumstantial evidence. *Hazle v. Ford Motor Co.,* 464 Mich. 456, 628 N.W.2d 515, 520–21 (2001); *Humenny,* 390 F.3d at 906. To establish an ELCRA discrimination claim using the *McDonnell Douglas* framework, a plaintiff is required to present evidence that (1) she was a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position, and (4) others, similarly situated and outside the protected class, were treated differently. *Town v. Mich. Bell Tel. Co.,* 455 Mich. 688, 568 N.W.2d 64, 68 (1997). If the plaintiff successfully proves a prima facie case, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. *Hazle*, 628 N.W.2d at 521–22. Once the employer carries this burden, the burden of production shifts back to the plaintiff to show that the legitimate reasons offered by the employer were not its true reasons, but rather were pretext for unlawful discrimination. *Id.* at 522.

2. Application

27

At the outset, it appears that Washington is claiming that the Union's failure to provide her with help and her termination were due to her gender.  Washington presents the following as evidence of gender discrimination.  She testified that she had been "bullied and threatened" "[b]ecause of the way they speak," and due to "[t]heir misunderstanding of how the dues are done," presumably referring to Short and Nwamba admonishing her because the dues were overdue.  (ECF No. 8-14, PageID.131-132).  The connection between those comments and her gender is unclear.  She further testified that Nwamba "has a problem with women," and "does not respect women," and that this is borne out in grievances filed against him regarding harassment by others.  (*Id*., PageID.132-133).  These grievances, however, are not in the record.  Washington also testified that:

> [Nwamba] treated me as if I was not a person, as if I didn't exist, you know, her, she.  Always using pronouns instead of my name; never acknowledging me.  If he needed somebody to do something, he always said, well, Dessine, tell Janice, or tell her what to do.  He never came to me himself and said, I needed this or I needed that, unless Dessine was not in the office, and he needed something immediately.

(*Id*., PageID.144).  Nwamba admitted that he refers to people using pronouns, but only based on how he learned English and believed to be correctly using nouns and pronouns.  (ECF No. 10-1, PageID.228).

Additionally, Washington complained of an instance where Nwamba said "I don't have to talk to her" regarding Washington, and "she could be my child; she needs to stop talking to Dessine, but speaking about me."  (ECF No. 8-14,

PageID.109-110). She also complained to Short about Nwamba in January 2018, specifically regarding Nwamba's request that she keep her office door open at all times. (*Id*., PageID.90-93). She objected to having her door open for safety reasons. (*Id*., PageID.93). However, Washington admitted that this complaint had "nothing to do with [her] race, [her] gender, [her] age, or [her] disability status." (*Id*., PageID.92).

Viewing Washington's testimony in a light most favorable to her, Washington has not presented direct evidence of gender discrimination. Nothing that has been submitted to the Court "*requires* the conclusion that unlawful discrimination was at least a motivating factor" of her termination. *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d at 926 (emphasis added). "[G]eneral, vague, or ambiguous comments" such as these "do not constitute direct evidence of discrimination because such remarks require a factfinder to draw further inferences to support a finding of discriminatory animus." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 708 (6th Cir. 2008) (citing examples). The evidence is, at best, circumstantial, thus requiring analysis under the *McDonnell Douglas* burden-shifting framework to establish a prima facie case. Though neither party has assessed the prongs of the framework specifically, Washington clearly fails to meet the fourth prong, which requires a showing that "others, similarly situated and outside the protected class, were

treated differently." *Town v. Mich. Bell Tel. Co.,* 568 N.W.2d at 68.  Indeed, the

record contains no evidence or reference to any similarly situated male who was

treated more favorably than Washington, either in terms of an accommodation or

in not being terminated under similar circumstances.  Thus, she has failed to make

out a prima facie case of gender discrimination.

Moreover, the Union has proffered a legitimate, nondiscriminatory reason

for her termination as discussed above with respect to claim under the PWDCRA.

Again, Washington has provided no evidence that the Union's reason for

terminating her – an inability to timely complete her work – was pretextual.  No

reasonable juror could conclude that Washington was terminated because of her

gender.  The undersigned therefore recommends that summary judgment be

granted in favor of the Union on Washington's gender discrimination claim.

## V.  Conclusion

The undersigned is not unsympathetic to Washington's plight.  Viewed in a

favorable light, there is evidence that her hours were reduced while her job duties

remained the same and her deadlines were tightened.  Moreover, the Union offered

her a new contract, which she had not yet signed, but then made the decision to

terminate her.  However, while her work piled up during her leave, the record

shows that Washington was behind on paying the dues in a timely manner before

her third surgery.  Unable to keep up, she was unfortunately terminated from her position.

In the end, there is not enough for a reasonable factfinder to conclude that the failure to accommodate her request and her termination were in violation of the PWDCRA.  Nor could a reasonable factfinder conclude that she was denied her request for help and terminated because of her gender.  Accordingly, the undersigned recommends that the Union's motion for summary judgment (ECF No. 8) be **GRANTED** in accordance with this opinion.

Dated: April 15, 2021                                   s/Kimberly G. Altman
Detroit, Michigan                                        KIMBERLY G. ALTMAN
                                                         United States Magistrate Judge

## <u>NOTICE TO PARTIES REGARDING OBJECTIONS</u>

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

31

*Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Under Local Rule

72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No.

2," etc.  Any objection must recite precisely the provision of this Report and

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR

72.1(d).  The response must specifically address each issue raised in the objections,

in the same order, and labeled as "Response to Objection No. 1," "Response to

Objection No. 2," etc.  If the Court determines that any objections are without

merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon
counsel of record and any unrepresented parties via the Court's ECF System to
their respective email or First Class U.S. mail addresses disclosed on the Notice of
Electronic Filing on April 15, 2021.


s/Marie E. Verlinde
MARIE E. VERLINDE
Case Manager

32